Michael C. Guasco, Bar No. 258765
mguasco@littler.com
Henry L. Aho, Bar No. 345334
haho@littler.com
LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, California 94104
Telephone: 415.433.1940
Fax No.: 415.399.8490

Attorneys for Plaintiff
ANTIOCH UNIVERSITY, a non-profit corporation

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTIOCH UNIVERSITY, a non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, in his official capacity as Attorney General of California; STEWART KNOX, in his official capacity as Secretary of the California Labor & Workforce Development Agency; KATRINA HAGEN, in her official capacity as Director of the California Department of Industrial Relations; LILIA GARCIA-BROWER, in her official capacity as Labor Commissioner, and Does 1-100,<br><br>Defendants. | Case No. 2:23-cv-5341<br><br>PLAINTIFF ANTIOCH UNIVERSITY'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF |

Comes now Plaintiff ANTIOCH UNIVERSITY, a non-profit corporation, who alleges as follows:

**INTRODUCTION AND SUMMARY OF CLAIMS**

1. California passed a protectionist statute to allow *California* non-profit universities to treat adjunct professors as exempt, while requiring non-profit universities who are incorporated outside of California to classify their adjunct professors as non-exempt.

4867-1868-2478.2 / 115945-1003

2. There is no non-discriminatory rational basis for this distinction. Indeed, the Legislative history of the relevant legislation does not even attempt to justify or explain the distinction.

3. Universities around the country utilize adjunct faculty to teach courses within their areas of expertise.

4. The use of adjuncts allows students to learn from individuals with practical, real-world experience in their fields.

5. Adjuncts have the flexibility and ability to teach courses that interest them. Unlike traditional, full-time faculty, adjunct professors can focus on teaching, as opposed to the "publish or perish" environment.

6. Numerous authors have noted that the educational harms caused by universities' insistence that their professors publish frequently, regularly, and often. (See, e.g., Gad-el-Hak; Publish or Perish – An Ailing Enterprise?. *Physics Today* (2004) 57(3):61-62; Editorial; Publish or perish. *Nature* (2010) 467: 252; Fanelli, D. *et al.*; Do Pressures to Publish Increase Scientific Bias? An Empirical Study from US States Data. *PLoS One* (2010) 5(4): e10271; Aitkenhead, D; Peter Higgs: I Wouldn't Be Productive Enough for Today's Academic System. *The Guardian* (Dec. 6, 2013) [describing how the famous physicist, whose name is attached to the Higgs boson particle discovered by the Hadron collider and who first theorized the existence of the particle in 1964, would not have been hired in today's academic culture].)

7. In 2020, California passed a law to clarify that adjunct professors should be considered exempt, provided certain conditions were met. (See, Cal. Assembly Bill 736 [hereinafter "AB736"], codified at Cal. Labor Code § 515.7.)

8. The Association of Independent California Colleges and Universities (AICCU), the primary sponsor of the bill, described the purpose of the bill as follows:

> [AB 736] provides statutory consistency for adjunct faculty wages at independent, nonprofit colleges and universities in California, and provides a baseline compensation for adjunct faculty and allows our

institutions to continue treating adjunct faculty as exempt employees under the Labor Code and relevant Wage Orders.

….

While adjunct faculty are regularly treated as exempt employees, recently several of our institutions have been forced to convert adjunct faculty to hourly, non-exempt employees in response to litigation stemming from ambiguity in the Labor Code. Conversion to hourly, non-exempt classification is not the preferred action of either the institutions or the faculty. However, lacking the change proposed in this legislation, this is the only means by which institutions can comply with Labor Code and prevent additional lawsuits, which are resulting in six- or seven-figure financial losses.

We believe this narrowly crafted solution allows our institutions to continue treating adjunct faculty as exempt employees and provides them the same level of professional flexibility as their full-time counterparts. (See, Sen. Com. on Labor, Public Employment and Retirement, Analysis of Assem. Bill No. 736 (2019-2020 Regular Session) at p. 4 [brackets and ellipses in original].)

9.  Notably absent from the statement is any reason that universities incorporated in California should be treated differently than universities incorporated out of state.

10.  Because AB 736, as applied to Plaintiff, is discriminatory in intent and effect, it violates the Commerce Clause, the Dormant Commerce Clause, the Privileges and Immunities Clause, the Equal Protection Clause, and the Due Process Clause of the United States Constitution.

## PARTIES

11.  Antioch University (hereinafter, "Plaintiff" or "Antioch") is a 501(c)(3)

4867-1868-2478.2 / 115945-1003

3
PLAINTIFF'S COMPLAINT

non-profit corporation, incorporated in the state of Ohio in 1852. It was started as Antioch College by Horace Mann, a lawyer, Congressman, abolitionist, and social reformer. He is considered by many to be the founder of modern public education in the United States. In his first graduation speech, Rep. Mann implored the Antioch graduates to "be ashamed to die until you have won some victory for humanity." Those words remain a guiding light of Plaintiff's values and an underlying commitment to an Antioch education.

12. In the 1920s, Antioch instituted an innovation that would be modeled by universities around the country. Antioch was the first liberal arts college in the United States to introduce a co-op program, a structured method of education that combines classroom-based education with practical, real-work experience.

13. In the 1960s, as part of the broader "university without walls" movement, Antioch began opening satellite campuses across the country to better reach students who would benefit from Antioch's academic excellence and experiential learning. Today's Antioch University is composed of Antioch University New England, Antioch University Midwest, Antioch University Los Angeles, Antioch University Santa Barbara, Antioch University Seattle, Antioch University Online, and the University's Graduate School of Leadership & Change.

14. Antioch, a non-profit organization, has been continually accredited by the Higher Learning Commission, a United States Department of Education approved accreditation agency, since 1927. Its various programs are accredited by numerous other agencies, including the California Commission on Teacher Credentialing, the American Psychological Association, and others. It is certified and treated as an in-state institution by the California Department of Consumer Affairs' Bureau for Private Postsecondary Education (BPPE).

15. Today, Antioch's online programs and Los Angeles and Santa Barbara campuses provide educational opportunities for a wide variety of non-traditional students including working adults, single parents, and others who would otherwise not

have access to quality post-secondary education.

16. As articulated by its Mission Statement, "Antioch University provides learner-centered education to empower students with the knowledge and skills to lead meaningful lives and to advance social, economic, and environmental justice." "Antioch aspires to be a leading university offering learners and communities transformative education in a global context that fosters innovation and inspires social action."

17. Defendant Rob Bonta (hereinafter "Bonta") is the elected Attorney General of California, the chief law enforcement officer of the state. He is charged by Article V, Section 13 of the California Constitution with the duty to see the laws of California are uniformly and adequately enforced.

18. Defendant Stewart Knox (hereinafter "Knox") is the appointed Secretary of the California Labor & Workforce Development Agency (hereinafter "LWDA"). He is charged by Cal. Govt. C. § 15554 with issuing orders necessary to effectuate the purpose of the LWDA.

19. Defendant Katrina Hagen (hereinafter "Hagen") is the Director of the California Department of Industrial Relations (hereinafter "DIR"). The DIR "is the state agency designated to be responsible for administering the state plan for the development and enforcement of occupational safety and health standards relating to issues covered by corresponding standards promulgated under the federal Occupational Safety and Health Act of 1970." (Cal. Labor Code § 50.7(a).)

20. Defendant Lilia Garcia-Brower (hereinafter "Garcia-Brower") is the Labor Commissioner of the state of California. The Labor Commissioner is the chief of the Division of Labor Standards Enforcement and is charged by statute with enforcing labor standards. (Cal. Labor Code §§ 90.5, *et seq*.)

## JURISDICTION AND VENUE

21. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because the action arises under the Constitution and laws of the

United States.

22. Declaratory relief is authorized by 28 U.S.C. §§ 2201-2202.

23. Venue in this Court is appropriate pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this district.

**GENERAL ALLEGATIONS**

24. California has a detailed scheme of wage and labor standards that are codified in various provisions of the California Labor Code, California Government Code, and California Code of Regulations.

25. The applicability of many of these rules turn on whether an employee is classified as "exempt" or "non-exempt."

26. One common exemption is the "professional exemption." To qualify under the professional exemption, an employee must meet the "duties" test, which looks at the nature of the work performed, and the "wage" test, which looks at the amount paid for the work.

27. For many years, private, non-profit colleges and universities paid adjunct faculty as exempt, salaried employees. However, increasing litigation against such institutions led the California State Legislature to give clear guidance on the standards by which an institution could classify such professors as exempt.

28. This was accomplished through AB 736.

29. As is common in California, the originally introduced AB 736 had nothing to do with the pay of adjunct faculty. It was not until the bill was sent to the California Senate where an "amendment" was actually the wholesale introduction of the text of the ultimately enrolled statute. As such, this Complaint discusses the Legislative history beginning with the Analysis of the Senate Committee on Labor, Public Employment and Retirement (Labor Committee Analysis).

30. The Labor Committee Analysis lays out the "Key Issue" as follows: "Should the Legislature explicitly clarify when an adjunct professor at an independent

4867-1868-2478.2 / 115945-1003

institution of higher learning qualifies as an exempt professional under wage and hour law?"

31. Rather than defining independent institutions of higher learning directly in the bill, the Legislature incorporated the existing definition in Education Code § 66010(b). (Labor Code § 515.7; Labor Committee Analysis, p. 1.)

32. In so doing, the Legislature did not even attempt to justify the discriminatory treatment of out-of-state nonprofit corporations.

33. Rather, the Legislature explicitly adopted a statute that facially discriminates against out-of-state corporations.

34. As noted above, AB 736 expressly applied its reach to Independent Institutions of Higher Learning as defined by Education Code § 66010(b).

35. The predecessor version of Sec. 66010 was passed in 1976 in order to define public higher education as part of the larger Donahue Higher Education Act. (Stats. 1976 ch. 1010 § 2.) It was subsequently amended twice (See, Amended Stats. 1983 ch. 143 § 44; Stats. 1990 ch. 1372 § 208 (SB 1854)), before being amended to define, for the first time, "Independent Institutions of Higher Learning." (Stats. 1991 ch. 1198 § 3 (AB 617).)

36. This definition was added by AB 617, a large, omnibus bill to amend and add numerous provisions to the Donahue Higher Education Act. Among the provisions added was a new subdivision (b) to Educ. C. § 66010 which defined Independent Institutions of Higher Learning as "those nonpublic higher education institutions which grant undergraduate degrees, graduate degrees, or both, and which are formed as nonprofit corporations *in this state* and are accredited by an agency recognized by the United States Department of Education. (*Ibid* [emphasis added].)

37. None of the legislative history for AB 617 articulates *any* rational basis for distinguishing nonprofit corporations formed in California from nonprofit corporations incorporated outside of California.

4867-1868-2478.2 / 115945-1003

## DORMANT COMMERCE CLAUSE VIOLATION

38. The Commerce Clause, as set forth in Article I, Sec. 8 of the United States Constitution, expressly grants Congress the power "[t]o regulate commerce with foreign Nations, among the several States, and with the Indian Tribes."

39. Inherent in Congress's Commerce Clause is " 'a further, negative command,' one effectively forbidding the enforcement of 'certain state [economic regulations] even when Congress has failed to legislate on the subject.' " (*National Pork Producers Council v. Ross*, ___ U.S. ___ Case No. 21-468 slip op. at p. 6 (May 11, 2023) quoting *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995) [brackets in original].)

40. Even if federal law is silent on an area of interstate commerce, states may not enact legislation that discriminates against or impermissibly burdens interstate commerce. (See, e.g., *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007).)

41. State laws that discriminate against interstate commerce face a virtually per se rule of invalidity under the Commerce Clause. The Supreme Court has explained that "discrimination" in this context "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." (*Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994).)

42. In evaluating whether an economic regulation meets *any* standard of review, courts have held that economic protectionism is not a legitimate state interest. (*Merrifield v. Lockyer*, 547 F.3d 978, 991 n. 15 (9th Cir. 2008); *Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38.)

43. The Supreme Court has repeatedly held that, in all but the narrowest of circumstances, state laws violate the Commerce Clause if they mandate differential treatment of in-state and out-of-state economic interests. (*Granholm v. Heald*, 544 U.S. 460, 466 (2005); *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994).)

## EQUAL PROTECTION VIOLATION

44. The Fourteenth Amendment guarantees all persons "equal protection under the law."

45. Corporations are "persons" under the Fourteenth Amendment. (See, e.g., *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 776 (1978); *Citizens United v. FEC*, 558 U.S. 310, 342-43 (2010); *BMW of North America v. Gore*, 517 U.S. 559 [holding the Fourteenth Amendment protected BMW, a corporation, from excessive punitive damages].)

46. The Equal Protection Clause, as set forth in the Fourteenth Amendment, prohibits a state from denying equal protection under the law; particularly, it prohibits a state from classifying people in a way that restrains fundamental rights, such as the right to earn a living, without meeting heightened scrutiny. (*Hussey v. City of Portland*, 64 F.3d 1260, 1265 (9th Cir. 1995).)

47. Labor Code § 515.7 treats two, otherwise similarly situated, types of entities differently. Such different treatment lacks any rational basis, let alone any heightened scrutiny.

## PRIVILEGES & IMMUNITIES VIOLATION

48. Article IV, § 2 of the United States Constitution states "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." Similarly, the Fourteenth Amendment states in part that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States…."

49. The Supreme Court has stated that "[t]he section, in effect prevents a State from discriminating against citizens of other States in favor of its own." (*Hague v. Committee for Industrial Organization*, 307 U.S. 496, 511 (1939).)

50. As Justice Bushrod Washington stated 200 years ago, the phrase "privileges and immunities" of citizenship include interests "which are, in their nature, fundamental; which belong, of right, to the citizens of all free governments. [They]

4867-1868-2478.2 / 115945-1003

may be comprehended under the following general heads: Protection by the government, the enjoyment of life and liberty, *with the right to acquire and possess property* of every kind, and to pursue and obtain happiness and safety." (*Corfield v. Coryell*, 6 F. Gas. 546, 551, 4 Wash. C.C. 371, No. 3230 (Circ. Ct. E.D. Pa. 1823) [emphasis added].)

51. More recently, the Supreme Court has stated that "the pursuit of a common calling is one of the most fundamental of those privileges protected by the Clause. Many, if not most, of our cases expounding the Privileges and Immunities Clause have dealt with this basic and essential activity." (*United Building & Construction Trades Council of Camden v. Mayor and Council of the City of Camden*, 465 U.S. 208, 219 (1984).)

52. "It was undoubtedly the object of the clause … to place the citizens of each State upon the same footing with citizens of other States…. It relieves them from disabilities of alienage in other States; it inhibits discriminating legislation against them by other States; it gives them the right of free ingress into other States, and egress from them; it insures to them in other States the same freedom possessed by the citizens of those States in the acquisition and enjoyment of property and in the pursuit of happiness." (*Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 180 (1868).)

53. The Supreme Court has explicitly held that the Privileges & Immunities Clause protects enumerated *and* unenumerated rights. (See, *Doe v. Bolton*, 410 U.S. 179, 200 (1973) [finding the Privileges & Immunities Clause precludes limiting access to medical care to state residents despite there not being a Constitutional right to medical care].)

54. If a state completely bars out-of-staters from engaging in a particular trade, the Privileges & Immunities Clause is very likely to ban such a rule. (See, *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 281; *Supreme Court of Virginia v. Friedman*, 487 U.S. 59 (1988).)

55. Even if a state is not categorically excluding out-of-state actors, if its

4867-1868-2478.2 / 115945-1003

regulations impose costs, fees, or financial burdens on out-of-state residents that are not imposed on in-state-residents, the Privileges & Immunities Clause bans such a rule. (See, e.g., *Ward v. Maryland*, 79 U.S. (12 Wall.) 418 (1870); *Toomer v. Witsell*, 334 U.S. 385, 403 (1948).)

56. Several recent writings by members of the Supreme Court make clear that, even apart from published decisions, members of the Court feel that the Privileges and Immunities Clause should be read more broadly to protect citizens from economic harms imposed by protectionist states. (See, e.g., *National Pork Producers*, *supra*, (Kavanaugh, J. concurring in part and dissenting in part) (slip op., at 8); *South Dakota v. Wayfair, Inc.*, 585 U.S. ___ (2018) (Gorsuch, J. concurring) (slip op., at 1-2); *Tyler Pipe Industries, Inc. v. Washington State Dept. of Revenue*, 483 U.S. 232, 265 (1987) (Scalia, J. concurring in part and dissenting in part); *Timbs v. Indiana*, 586 U.S. ___; 139 S.Ct. 682, 691-92 (2019) (Thomas, J. concurring in the judgment); *Timbs*, *supra*, 139 S.Ct. at 691 (Gorsuch, J. concurring); *McDonald v. Chicago*, 561 U.S. 742, 813 (Thomas, J. concurring).)

## DUE PROCESS VIOLATIONS

57. The Fifth and Fourteenth Amendments to the Constitution prohibit the United States and the state governments from depriving any person "of life, liberty, or property without due process of law."

58. Necessarily included within these clauses is "a substantive sphere as well, 'barring certain government actions regardless of the fairness of the procedures used to implement them.' " (*County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998).)

59. While the extent of economic liberty protected by the Substantive Due Process doctrine has ebbed and flowed over the years, the concept of protection of economic liberty has been enshrined by the Supreme Court for over 150 years. (*Loan Association v. Topeka*, 87 U.S. (20 Wall.) 655, 662-63 (1874); see also *Munn v. Illinois*, 94 U.S. 113, 125-26 (1876).)

4867-1868-2478.2 / 115945-1003

60. While courts examining economic regulations are highly deferential to the legislatures, there must be a *legitimate* government interest to which the regulation is *rationally* related. (*United States v. Carolene Products Co.*, 304 U.S. 144, 152 (1938); see also, *Romer v. Evans*, 517 U.S. 620, 631-32 (1996).)

## DECLARATORY JUDGMENT IS NECESSARY

61. There is an actual and present controversy between the parties. Plaintiff has been sued under California's Private Attorney General Act ("PAGA"). While these actions are not directly brought by named defendants, under California law, such actions are brought by individuals as the "proxy or agent of the state's law enforcement agencies…." (*Tanguilig v. Bloomingdales, Inc.*, 5 Cal.App.5th 665, 671 (2016) overruled on other grounds by *Viking River Cruises, Inc. v. Moriana*, 596 U.S. ___ [142 S.Ct. 1906] (2022) [internal citations and quotations excluded].) The California Supreme Court has affirmatively declared that the state of California "is always the real party in interest in the suit." (*Iskanian v. CSL Transportation Los Angeles, LLC*, 59 Cal.4th 348, 382 (2014).)

62. As the United States Supreme Court has acknowledged, PAGA is a unique statute with its own unique, developing lexicon. (*Viking River*, *supra*, 142 S.Ct. at 1916.)

63. Prior to PAGA, enforcement of California's various wage and hour and employment regulations was vested with the Labor and Workforce Development Agency ("LWDA"). (*Id* at 1913-14.) However, the Legislature felt the LWDA did not have the resources necessary to effectively execute this responsibility and that budget concerns prevented directly providing the level of funding that would be necessary. (*Ibid.*)

64. The California Legislature enacted PAGA to address these perceived deficiencies by drafting the public as private attorneys general. (*Ibid.*) An "aggrieved employee" who wishes to bring a suit under PAGA must send notice to the employer and the LWDA. The LWDA then has the authority to investigate and bring an

enforcement action. If the LWDA does not initiate an investigation within a certain time period, the alleged "aggrieved employee" is automatically authorized to bring an action under PAGA. (*Id* at 1914.)

65. Despite the above, PAGA does not provide any mechanism for state actors to intervene and control the litigation beyond the decision to investigate and sue on their own at the outset of the case. The statute does not allow any government actors to take control of the action after the initial deadline. (See, *Magadia v. Wal-Mart Assocs., Inc.*, 999 F.3d 668, 677 (9th Cir. 2021) [holding that PAGA "lacks the procedural controls necessary to ensure that California" retains "substantial authority over the case" (internal quotation marks omitted)].)

66. In passing AB 736, the California State Legislature acknowledged the significantly increased cost associated with being unable to properly classify adjunct faculty as exempt personnel. (See, e.g., Labor Committee Analysis at pp. 3-4.)

67. Despite this, Plaintiff is being put in the position of needing to incur these increased costs. Without a declaration that the distinction violates the United States Constitution, Antioch, a non-profit organization, will continue to be put at severe economic disadvantage by needing to incur costs that other, similarly situated schools do not.

## INJUNCTIVE RELIEF IS NECESSARY

68. Plaintiff is currently harmed and faces threat of continuing, ongoing harm due to Defendants' enforcement and enforcement brought by individuals acting as agents and proxies of Defendants. If not enjoined by this Court, Defendants, and their legal agents, will continue to enforce the Challenged Provisions in derogation of Plaintiff's constitutional rights. Plaintiff has no plain, speedy, and adequate remedy at law. Damages are indeterminate or unascertainable and, in any event, would not fully redress any harm suffered by Plaintiff.

## *YOUNGER* ABSTENTION DOES NOT BAR PLAINTIFF'S CLAIMS

69. As a general rule, federal courts will not grant injunctive relief when

there are ongoing enforcement actions pending in state court. (*Younger v. Harris*, 401 U.S. 37 (1971).) However, the Supreme Court has also cautioned that lower courts should keep in mind that abstention is an extraordinary exception, not the rule. (*Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 81-82 (2013) ["In the main, federal courts are obliged to decide cases within the scope of federal jurisdiction. Abstention is not in order simply because a pending state-court proceeding involves the same subject matter."]; see also *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 373 (1989) (hereinafter "*NOPSI*") ["[T]here is no doctrine that … pendency of state judicial proceedings excludes the federal courts."].)

70. First, *Younger* abstention only applies to limited types of cases. (*Ibid*.) While state enforcement actions are generally included in such types of cases, part of the reason is the presumption of good faith of the state actors. (*Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975); *Sprint Communications*, *supra*, 571 U.S. at 79-80.)

71. In the context of a PAGA action, there are no state actors involved in the litigation. A private individual initiated the action, not a state actor in its sovereign capacity. There is no evidence any state actor conducted an investigation and no state actor lodged a formal complaint against Antioch. (Cf. *Sprint Communications*, *supra*, 571 U.S. at 80.) As the Court stated in *Sprint Communications*, "to guide other federal courts, we today clarify and affirm that *Younger* extends to the three 'exceptional circumstances' identified in *NOPSI*, but no further." (*Ibid*.) Because PAGA does not hold all of the hallmarks of a quasi-criminal action as described in *Sprint Communications*, such actions are not subject to *Younger* abstention.

72. Additionally, *Younger* abstention does not apply in cases in which a federal court plaintiff does not have a meaningful opportunity to raise its Constitutional defense.

73. As the United States Supreme Court has acknowledged, PAGA is a unique statutory scheme. (*Viking River*, *supra*, 142 S.Ct. at 1913-14.) While the case is ostensibly by the state of California, the reality is that elected officials do not

participate in the action in any way. As such, there is little, to no, way to bring a constitutional challenge in a private action in which defendants in this action are not participating.

74. Additionally, California state courts are notoriously backed up and litigation is taking substantial time. (See, e.g., Lewis, R. *Justice delayed: Courts overwhelmed by pandemic backlog*, Cal Matters (March 8, 2022) [https://calmatters.org/justice/2021/01/justice-courts-overwhelmed-pandemic; last accessed June 26, 2023]; *Violent crime cases dismissed as court backlog in Riverside County continues*, CBS Los Angeles (December 15, 2022) [https://www.csbsnews.com/amp/losangeles/news/violent-crime-cases-dismissed-as-court-backlog-in-riverside-county-continues/ (last accessed June 26, 2023)].) This raises a significant issue for Antioch, namely that any decision on constitutionality that Antioch could obtain- assuming it is able to do so given the lack of actual state actors in the litigation- would not be for several months at the earliest. This puts Antioch in an impossible situation, namely it must choose to either change all of its adjunct professors to hourly, non-exempt and incur the costs associated therein or, it must risk further liability in the event the California state court does not rule in its favor. Under either scenario, Antioch, a non-profit organization, would suffer irreparable injury.

75. Additionally, *Younger* abstention does not apply to patently unconstitutional acts. (*Sprint Communications*, *supra*, 571 U.S. at 77.) As explained in more detail *supra*, AB 736 violates is discriminatory on its face and strikes at the heart of what the Dormant Commerce Clause and the Privileges & Immunities Clauses were designed to prevent.

76. In short, there are multiple reasons why *Younger* abstention is not an impediment to this Court granting the requested relief.

///

///

4867-1868-2478.2 / 115945-1003

# FIRST CLAIM FOR RELIEF

## Violation of the Dormant Commerce Clause

(U.S. Const., Art. I, § 8)

(Against All Defendants)

77. Plaintiff realleges and incorporates Paragraphs 1-76 as though fully set forth herein.

78. As drafted, AB 736 discriminates against out-of-state corporations in favor of in-state corporations. This strikes at the very core of what the Supreme Court has said is the purpose of the Dormant Commerce Clause. (*Granholm*, *supra*, 544 U.S. at 466.)

79. Regardless of which level of scrutiny such a rule would receive, this distinction fails as there is no rational, legitimate government interest advanced by the distinction.

# SECOND CLAIM FOR RELIEF

## Violation of the Equal Protection Clause

(U.S. Const., Amendment 14)

(Against All Defendants)

80. Plaintiff realleges and incorporates Paragraphs 1-79 as though fully set forth herein.

81. AB 736 treats different entities differently without a rational basis.

82. Because AB 736, as applied to Plaintiff, fails rational basis review, it necessarily fails intermediate and strict scrutiny.

# THIRD CLAIM FOR RELIEF

## Violation of the Privileges and Immunities Clause

(U.S. Const., Art. IV, § 2; U.S. Const., Amendment 14)

(Against All Defendants)

83. Plaintiff realleges and incorporates Paragraphs 1-82 as though fully set forth herein.

84. AB 736, by incorporating the language of Education Code § 66010(b), discriminates against out-of-state corporations for no reason other than blatant protectionism.

85. This strikes at the very heart of what the Privileges and Immunities Clause is designed to prevent.

## FOURTH CLAIM FOR RELIEF
## Violation of the Due Process Clause
(U.S. Const., Amendment 5; U.S. Const., Amendment 14)

(Against All Defendants)

86. Plaintiff realleges and incorporates Paragraphs 1-85 as though fully set forth herein.

87. AB 736, by making a classification (out-of-state vs. in-state corporations) that fails even rational basis review, violates Plaintiff's substantive due process.

## PRAYER FOR RELIEF

Wherefore Plaintiff prays the Court:

1. Enter a declaratory judgment under 28 U.S.C. § 2201 that Education Code § 66010(b) and Labor Code § 515.7 are unconstitutional as applied to Plaintiff, because these sections violate the Dormant Commerce Clause of the Constitution;

2. Enter a declaratory judgment under 28 U.S.C. § 2201 that Education Code § 66010(b) and Labor Code § 515.7 are unconstitutional as applied to Plaintiff, because these sections violate the Equal Protection Clause of the Constitution;

3. Enter a declaratory judgment under 28 U.S.C. § 2201 that Education Code § 66010(b) and Labor Code § 515.7 are unconstitutional as applied to Plaintiff, because these sections violate the Privileges and Immunities Clause of the Constitution;

4. Enter a declaratory judgment under 28 U.S.C. § 2201 that Education Code § 66010(b) and Labor Code § 515.7 are unconstitutional as applied to Plaintiff, because these sections violate the Due Process Clause of the Constitution;

5. Issue an injunction enjoining Defendants, and their officers, agents, proxies, and employees from bringing, prosecuting, or maintaining any enforcement action on the basis that adjunct faculty are misclassified as exempt provided Plaintiff is in compliance with the remaining requirements of Labor Code § 515.7;

6. Award remedies available under 42 U.S.C. § 1983 and all reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988, or any other applicable statute; and

7. Grant such further relief as the Court deems just and proper.

Dated: July 5, 2023

LITTLER MENDELSON, P.C.

/s/ *Michael C. Guasco*
Michael C. Guasco
Henry Aho

Attorneys for Plaintiff
ANTIOCH UNIVERSITY, a non-profit corporation

4867-1868-2478.2 / 115945-1003